Timothy W. Seaver
SEAVER & WAGNER, LLC
500 L Street, Suite 501
Anchorage, Alaska 99501
Telephone: (907) 646-9033
Facsimile: (907) 258-7280
tseaver@seaverwagner.com

Nicholas Woodfield, Esq., *Pro Hac Vice to be filed*
R. Scott Oswald, Esq., *Pro Hac Vice to be filed*
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com
soswald@employmentlawgroup.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA
Anchorage Division**

| | |
|---|---|
| **KENNETH OSTERKAMP,**<br><br>*Plaintiff*,<br>**v.**<br><br>**AARP,**<br><br>*Defendant*. | **Case No.:** _____<br><br>**JURY TRIAL DEMANDED** |

**CIVIL COMPLAINT FOR MONETARY
AND EQUITABLE RELIEF AND DEMAND FOR JURY TRIAL**

1. AARP unlawfully discriminated against Kenneth Osterkamp ("Osterkamp") in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.*, and the Alaska Human Rights Law, Alaska Stat. § 18.80, *et seq.*, when it subjected his performance to

1

heightened scrutiny, placed him on administrative leave, and terminated his employment because of his sex.

2.      AARP unlawfully retaliated against Osterkamp in violation of Title VII of the Civil Rights Act of 1964 when its managers placed him on administrative leave and terminated his employment after he raised internal complaints about discriminatory and hostile comments made about men in the workplace.

## PARTIES

3.      Plaintiff Kenneth Osterkamp is a resident of the State of Alaska and resides in Anchorage, Alaska.

4.      Defendant AARP is a nonprofit entity organized under the laws of the District of Columbia, and its headquarters and principal place of business is in Washington, DC. AARP's maintains a state office located at 3601 C Street, Suite 1420 in Anchorage, Alaska.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq*.

6.      Osterkamp has exhausted the administrative remedies available to him, and the United States Equal Employment Opportunity Commission issued Osterkamp a Notice of Right to Sue on July 31, 2019. This Complaint and Demand for Jury Trial has been timely filed within the 90-day period since the EEOC issued its Notice of Right to Sue.

7. Venue in this District is appropriate under 28 U.S.C. § 1391 because Defendant AARP has significant and deliberate contacts with Alaska and because this District is the location in which the alleged unlawful acts took place.

## FACTUAL ALLEGATIONS

8. Kenneth Osterkamp is a 52-year-old man.

9. In or about September 2006, AARP hired Osterkamp to serve as its State Director for Alaska. As a State Director, Osterkamp was responsible for oversight and management of the state office in Alaska. Osterkamp managed a staff of four at the AARP state office in Anchorage. This office was responsible for social impact activity, including expanding access to healthcare, expanding financial security, and expanding livable communities.

10. As State Director, Osterkamp had the responsibility to appoint a volunteer State President. A State President for AARP serves as the lead AARP volunteer in the state. A State Director appoints the volunteer State President for two-year terms, and a person may be appointed for up to three terms consecutively.

11. In or about 2014 or January 2015 Osterkamp appointed Terry Snyder as volunteer State President. Snyder is a woman who is 65 years old. As volunteer State President Snyder would come to the Alaska state office in Anchorage about once or twice per week, and Osterkamp would interact with her, on average, about that often. Snyder's efforts on behalf of AARP centered primarily on the establishment of livable communities in Alaska.

12. Throughout Osterkamp's years of interaction with Snyder as volunteer State President he and the state staff observed Snyder's habit of inappropriate attempts to exert control over the state office's staff and resources. In or about 2018 there was a marked increase in this behavior to the point where it became a problem for Osterkamp and his staff. Snyder treated the

3

state office staff as a staff that she could personally command, and the state office's resources as resources that she could personally allocate.

13. Snyder placed calls to AARP's national headquarters and complained that the state office "moved too slowly" on a project she championed. Snyder also placed calls to AARP's national headquarters without first consulting the state staff if she disagreed with the office's approach. Further, Snyder met with external stakeholders and committed the state office's staff and resources to projects without the consultation of the Alaska state office. And Snyder invited outside stakeholders to meetings at the Alaska state office without first consulting Osterkamp or the staff.

14. Snyder also frequently made disparaging remarks about men in the workplace. In reference to the staff of the Alaska state office, which consisted of four men and one woman, Snyder would make comments to the effect of "the testosterone is getting thick in here" and "this place is full of toxic masculinity." In response to any statements that Snyder perceived as complaints on the part of Osterkamp or other male members of the Alaska staff, Snyder would make statements such as "put on your big boy underwear" or "don't get your wee-wee in a knot." Additionally, on several occasions in which Osterkamp drove Snyder in his Jeep to AARP events, Snyder would make comments to the effect of, "I see you brought your penis extension along."

15. In or about mid-2015, AARP underwent a reorganization. As part of that process all regional vice presidents had to reapply for their positions. Prior to the reorganization most of the regional vice presidents were men. After the reorganization, nearly all of the regional vice presidents were women. After only the then-incumbent Vice President for the Western Region

Rob Ence, a man, applied for the position, the AARP national office asked Kim Adler to apply for the position as well.

16. AARP then named Kim Adler Vice President for the Western Region in or about October 2015. As Vice President for the Western Region Adler was responsible for Alaska, Hawaii, Oregon, Idaho, Montana, Wyoming, Nevada, Utah, New Mexico, and Colorado. Adler, however, lives and works in the District of Columbia. Adler is the only regional vice president at AARP who does not reside in her region.

17. From 2015 through 2019, Adler would visit the Alaska state office in person only about once per year. And Osterkamp would otherwise see Adler in person two to three times per year at regional meetings.

18. Osterkamp observed that Adler showed favoritism toward women in personnel decisions. Nearly all the hires made by Adler during Osterkamp's time working under her supervision were women. And almost everyone that Adler appointed as an interim state director, which is a common steppingstone to a state director position, was a woman.

19. Throughout 2018 the Alaska state office staff's relationship with Snyder weakened, and Osterkamp began to receive more complaints from the staff about Snyder's actions and comments. In one instance Osterkamp planned to hire a male volunteer to take on the task of training people over the age of 50 on the use of smartphones. Snyder insisted that Osterkamp should not appoint this man as a volunteer because her friend's husband had previously fired him from a job Snyder became angry with Osterkamp because he brought on a volunteer who Snyder personally disliked. Snyder became angry because she perceived that Osterkamp would not simply "take her word for it." In or about July 2018 Snyder became upset

5

again when Osterkamp chose to hire a new communications director that was not the candidate favored by Snyder.

20. In about August 2018 Osterkamp was out of the office for several weeks on a personal vacation. During this time, Snyder, Jenn Baier, and the interim state director, a woman named Jackie Boland, met in the Alaska office on a project known as the Penalosa project, which was a project championed by Snyder. The project committed the Alaska staff's time and the office's resources to a large project involving many outside stakeholders. Osterkamp only learned of the project upon his return to the office. Snyder, Baier and Boland worked up the project behind closed doors, never consulting anyone on the Alaska state staff about the project. During this time period, Snyder also continued to make comments about men and male genitalia to the Alaska staff.

21. Jenn Baier is the West Regional Advisor who reports directly to Adler. Baier works remotely from her home in Minnesota. Baier and Osterkamp had a friendly relationship. They would often exchange jokes, and they had similar tastes in movies and music.

22. In or about the week of January 14, 2019, Baier and Osterkamp both participated in a Skype regional call. While on the call, Baier had her hair pulled back and wore bright lipstick. As a joke, Osterkamp superimposed a photograph of Baier's head on to one of the women from the music video of the Robert Palmer song "Addicted to Love." Osterkamp sent the picture to Baier over email and wrote a comment to the effect of, "Am I the only one who gets this reference?" A few minutes later, Baier responded with words to the effect of, "LOL. Kim told me I have to look more professional to get a State Director job." Baier was actively pursuing a State Director position at that time. After Osterkamp was fired in March 2018, Baier expressed interest to Daryl Royce, a state office staff member, in applying for Osterkamp's job.

6

23. On or about January 18, 2019, someone filed a complaint with HR regarding Osterkamp's sending Baier this picture. However, Osterkamp did not learn of the existence of the complaint until after he was terminated in or about March 2019, and he has not to date seen a copy of the complaint. Following Osterkamp's termination in March 2018 Baier stated to Daryl Royce in the state office that she had not filed the complaint herself and did not know it had been filed on her behalf.

24. On or about January 23, 2019, Osterkamp had a performance review meeting with Adler over the telephone. Kim told Osterkamp that she had awarded him a performance rating of "3." This rating is a "good" rating, and it is a standard rating for high performers at AARP to receive when they are "setting and meeting challenging objectives."

25. But later that day or the next day Osterkamp received a copy of Adler's written review. The written review did not match Adler's oral review, and it included criticisms of Osterkamp. Adler wrote that she had observed teasing and inappropriate behavior by the Alaska staff when she was in the office. However, at the time Adler wrote those comments, she had not been in the Alaska office for about a year.

26. In or about late January 2019 Osterkamp completed year-end reviews, in which he gathered feedback from his team about what improvements might be needed. During the year-end reviews Osterkamp again received criticisms and complaints regarding Snyder from his team. These concerns involved both her issues of crossing staff/volunteer boundaries, as well as the inappropriate comments to staff members.

27. In response to his receipt of these concerns and complaints Osterkamp sent several emails to Kim Adler and had a conversation with her about the behavior that he and his team had witnessed on the part of Snyder. Osterkamp reported specifically that his staff felt

7

uncomfortable with Snyder's comments about men and male genitalia. Osterkamp sent details emails regarding Snyder's behavior to Adler on or about January 25 and 29, 2019 and on February 1, 2019. And in these emails, Osterkamp indicated to Adler that he did not plan to reappoint Snyder for a final term as State President. On the same day, January 25, that Osterkamp informed Adler that his intent was not to reappointment Snyder, a complaint was filed against him by a person unknown for retaliation against Snyder. Osterkamp did not learn of the existence of the complaint until after he was terminated in March 2019, and he has not to date seen a copy of the complaint.

28. On or about January 31, 2019, Adler told Osterkamp that she wanted to retain Snyder as State President and told Osterkamp not to contact Snyder or take any action regarding Snyder's appointment until they had further discussed it. Adler also reiterated her "perception" that there were problems in Osterkamp's office. After these conversations, Adler began to interact with Osterkamp much less frequently. When Osterkamp requested meetings to discuss resolving the state president appointment issue, Adler would ignore or delay her responses, and when Adler did accept appointments she would cancel at the last minute with no explanation or attempt to reschedule. Adler also did not follow up through all of February 2019 regarding Osterkamp's complaints about Snyder or his notice that he intended to not reappoint Snyder as State President.

29. On or about March 6, 2019, after he had received no further feedback from Adler regarding his complaints and concerns about Snyder, Osterkamp wrote Adler an email in which he told her that he intended to move forward with not reappointing Snyder as State President. Then, on or about March 7, 2019, Adler wrote an email to Osterkamp in which she again instructed him and his staff to have no further communications with Snyder and not to take any

8

Case 3:19-cv-00245-JWS   Document 1   Filed 09/10/19   Page 8 of 15

action until Adler spoke to him. Adler further instructed Osterkamp that it was not within his discretion to not reappoint Snyder. This was despite the fact that Osterkamp had email and voice conversations with AARP's chief of volunteers, Megan Hookey, who told him and provided documentation in the form of the official AARP state president position description that the volunteer state president position was appointed by, reports to and is managed solely by the State Director

30. Also that day, on or about March 7, 2019, Osterkamp decided to elevate his concerns about his state president's behavior and Adler's lack of response regarding the issue to HR and contacted Nancy Cariello in AARP's HR Department by email, and then followed up by leaving a voicemail when Cariello didn't answer.

31. Later the same day, on or about March 7, 2019, Lynn Hawthorne (also in AARP HR) made a call to Osterkamp, and she told Osterkamp she wanted to interview him about an ongoing investigation. Hawthorne proceeded to ask Osterkamp about his relationship with his staff, Jenn Baier, Kim Adler and Terry Snyder. Hawthorne did not inform Osterkamp at that time about any complaints that might have been leveled against him, and she was generally combative in her approach. Hawthorne told Osterkamp that if he believed he was being retaliated against he should say so, and Osterkamp informed her that he believed that was the case. However, Hawthorne did nothing with Osterkamp's complaint. Hawthorne placed Osterkamp on administrative leave until the investigation was complete, and when Osterkamp questioned when that might be, Hawthorne said "it's an investigative process, not something that's going to be resolved overnight." Yet he was terminated one business day later.

32. Osterkamp never saw either complaint before he was terminated. And AARP never told Osterkamp what the behavior was on the part of Snyder that had purportedly led him

9

to retaliate, or what form the alleged retaliation had taken. Hawthorne then placed Osterkamp on paid administrative leave pending the outcome of the investigation. On or about March 10, 2019, Osterkamp filed a complaint of retaliation against Kim Adler.

33. On or about March 10, 2019, Osterkamp prepared and sent to Cariello a complaint of retaliation by Adler that included documentation in the form of emails and other correspondence. The next day, on or about March 11, 2019, Carielo confirmed receipt of Osterkamp's complaint of retaliation. Then, within an hour of Carielo's acknowledging receipt, AARP informed Osterkamp that it would terminate his employment.

34. AARP replaced Osterkamp with a woman named Megan Hookey, the chief of volunteerism for AARP and the same person who had counseled him that he had the discretion to not reappoint Snyder as volunteer state president. Hookey now serves as Interim State Director, a service that is typically rewarded with a substantial cash bonus, and starting later in September of 2019 Osterkamp's replacement as AARP's Alaska State Director is a woman named Theresa Holt, who is currently the Long Term Care Ombudsman for the State of Alaska.

35. On or about April 10, 2019, Carielo informed Osterkamp that AARP had found his complaint of retaliation to be unsubstantiated, with no explanation of why or what form her investigation took.

36. As the result of AARP's illegal actions, Osterkamp has suffered monetary damages and mental anguish and will continue to sustain damages into the foreseeable future.

### COUNT I
### Sex Discrimination
### Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e, *et seq*.

37. Osterkamp incorporates the foregoing allegations as though fully alleged herein.

10

38. At all times relevant to this complaint, AARP was an employer as defined in and provided for under Title VII.

39. At all times relevant to this complaint, Osterkamp was an employee as defined in and provided for under Title VII.

40. Osterkamp is a man, which is a protected class under Title VII.

41. Throughout the course of his employment, Osterkamp had a strong record of performance and met the legitimate expectations of AARP, including receiving a "performance plus" award and cash bonus in the Fall of 2018

42. AARP subjected Osterkamp to an adverse employment action when it placed him on administrative leave on or about March 7, 2019.

43. AARP subjected Osterkamp to an adverse employment action when it terminated his employment on March 11, 2019.

44. AARP, through Adler, took these actions against Osterkamp as part of a pattern in which Adler showed favoritism to female employees and in which Adler downgraded Osterkamp's performance based upon her "perception" that he oversaw a problematic office.

45. AARP then replaced Osterkamp with a woman named Megan Hookey.

46. AARP's actions against Osterkamp occurred under circumstances that give rise to a reasonable inference of discrimination in violation of Title VII.

47. AARP's's purported legitimate business reasons for the actions taken against Osterkamp are mere pretext.

48. Due to AARP's unlawful violation of the Title VII, Osterkamp has suffered damages.

## COUNT II
## Retaliation

11

**Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e,** *et seq***.**

49. Osterkamp incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

50. At all times relevant to this complaint, AARP was an employer as defined in and provided for under Title VII.

51. At all times relevant to this complaint, Osterkamp was an employee as defined in and provided for under Title VII.

52. Osterkamp engaged in protected activity under Title VII when he reported inappropriate comments to Kim Adler about men and male genitalia made to his male staff members by Terry Snyder.

53. Osterkamp engaged in protected activity under Title VII when he made a complaint to Human Resources that he believed Kim Adler had retaliated against him for his complaints about Terry Snyder's behavior.

54. A short time after Osterkamp made protected disclosures to Adler, Adler retaliated against Osterkamp when she marginalized him and refused to address his complaints.

55. A short time after Osterkamp made protected disclosures to Adler, AARP retaliated against Osterkamp when it began an investigation into Osterkamp during which it suspended him from work.

56. A short time after Osterkamp made protected disclosures to Adler and a short time after Osterkamp filed a complaint of unlawful retaliation against Adler, AARP terminated Osterkamp's employment.

57. AARP's purported legitimate business reasons for the actions taken against Osterkamp are mere pretext.

12

58. Due to AARP's unlawful violation of the Title VII, Osterkamp has suffered damages.

## COUNT III
### Sex Discrimination
### Alaska Human Rights Law, Alaska Stat. § 18.80, *et seq.*

59. Osterkamp incorporates the foregoing allegations as though fully alleged herein.

60. Throughout the course of his employment, Osterkamp had a strong record of performance and met the legitimate expectations of AARP, including receiving a "performance plus" award and cash bonus in the Fall of 2018

61. AARP subjected Osterkamp to an adverse employment action when it placed him on administrative leave on or about March 7, 2019.

62. AARP subjected Osterkamp to an adverse employment action when it terminated his employment on March 11, 2019.

63. AARP, through Adler, took these actions against Osterkamp as part of a pattern in which Adler showed favoritism to female employees and in which Adler downgraded Osterkamp's performance based upon her "perception" that he oversaw a problematic office.

64. AARP then replaced Osterkamp with a woman named Megan Hookey.

65. AARP's actions against Osterkamp occurred under circumstances that give rise to a reasonable inference of discrimination in violation of the Alaska Human Rights Law.

66. AARP's's purported legitimate business reasons for the actions taken against Osterkamp are mere pretext.

67. Due to AARP's unlawful violation of the Alaska Human Rights Law, Osterkamp has suffered damages.

## COUNT IV
### Retaliation

13

**Alaska Human Rights Law, Alaska Stat. § 18.80,** *et seq.*

68. Osterkamp incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

69. Osterkamp engaged in protected activity under the Alaska Human Rights Law when he reported inappropriate comments to Kim Adler about men and male genitalia made to his male staff members by Terry Snyder.

70. Osterkamp engaged in protected activity under the Alaska Human Rights Law when he made a complaint to Human Resources that he believed Kim Adler had retaliated against him for his complaints about Terry Snyder's behavior.

71. A short time after Osterkamp made protected disclosures to Adler, Adler retaliated against Osterkamp when she marginalized him and refused to address his complaints.

72. A short time after Osterkamp made protected disclosures to Adler, AARP retaliated against Osterkamp when it began an investigation into Osterkamp during which it suspended him from work.

73. A short time after Osterkamp made protected disclosures to Adler and a short time after Osterkamp filed a complaint of unlawful retaliation against Adler, AARP terminated Osterkamp's employment.

74. AARP's purported legitimate business reasons for the actions taken against Osterkamp are mere pretext.

75. Due to AARP's unlawful violation of the Alaska Human Rights Law, Osterkamp has suffered damages.

**PRAYER FOR RELIEF**

Based on the foregoing, Osterkamp respectfully requests that this Court award him the

following relief against AARP:

    A. Compensatory, non-economic damages;

    B. Equitable relief;

    C. Punitive damages;

    D. Pre-judgment interest;

    E. Reasonable attorneys' fees;

    F. Court costs; and

    G. Any other such relief that the Court may deem just and equitable.

## JURY DEMAND

Plaintiff Kenneth Osterkamp demands a trial by jury for any and all issues proper to be so tried.

/s/ Timothy W. Seaver
Timothy W. Seaver
SEAVER & WAGNER, LLC
500 L Street, Suite 501
Anchorage, Alaska 99501
Telephone: (907) 646-9033
Facsimile: (907) 258-7280
tseaver@seaverwagner.com

Nicholas Woodfield, Esq., *Pro Hac Vice to be filed*
R. Scott Oswald, Esq., *Pro Hac Vice to be filed*
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com
soswald@employmentlawgroup.com